## MICHIGAN RAILROAD TAX CASES.

PERE MARQUETTE R. CO. v. POWERS, Auditor General. DETROIT & M. R. CO. v. SAME. CHICAGO & N. W. RY. CO. v. SAME. TOLEDO, S. & M. RY. CO. v. SAME. MICHIGAN AIR LINE RY. CO. v. SAME. GRAND TRUNK WESTERN RY. CO. v. SAME. MICHIGAN CENT. R. CO. v. SAME. ANN ARBOR R. CO. v. SAME. CINCINNATI, S. & M. R. CO. v. SAME. CHICAGO, D. & C. GRAND TRUNK JUNCTION R. CO. v. SAME. MUNISING RY. CO. v. SAME. LAKE SUPERIOR & I. RY. CO. v. SAME. MARQUETTE & S. E. RY. CO. v. SAME. CHICAGO, M. & ST. P. RY. CO. v. SAME. MINERAL RANGE R. CO. v. SAME. PONTIAC, O. & N. R. CO. v. SAME. MINNEAPOLIS, ST. P. & S. S. M. RY. CO. v. SAME. COPPER RANGE R. CO. v. SAME. GOGEBIC & M. R. R. CO. v. SAME. MANISTEE & N. E. R. CO. v. SAME. ESCANABA & L. S. R. CO. v. SAME. GRAND RAPIDS & I. RY. CO. v. SAME. WISCONSIN & M. RY. CO. v. SAME.

(Circuit Court, W. D. Michigan, S. D. May 19, 1905.)

1. JURISDICTION OF FEDERAL COURTS — FEDERAL QUESTION — SUIT AGAINST STATE OFFICER.

A federal court has jurisdiction of a suit to restrain the collection of taxes levied under provisions of the Constitution and statutes of a state, which the bill, in good faith, alleges are repugnant to the Constitution of the United States, and where it is also alleged that the defendant, as a state officer, by his acts under said state Constitution and statute is about to deprive complainants of their property without due process of law.

2. SAME—EQUITY—RETAINING CASE TO ADMINISTER FULL RELIEF.

Where the jurisdiction of a federal court has been properly invoked for relief against assessments as discriminating against complainant, and depriving it of the equal protection of the laws, in violation of the fourteenth constitutional amendment, although such federal question is determined against complainant, the bill may be retained for the decision of other questions arising on the record.

3. CONSTITUTIONAL LAW — EQUAL PROTECTION OF LAWS — LIMITATION ON STATE'S POWER OF TAXATION.

The provisions of the fourteenth constitutional amendment, prohibiting states from depriving any person of his property without due process of law, and from denying to any person the equal protection of the laws, do not prevent a state from changing its system of taxation in all proper and reasonable ways, nor compel it to adopt any iron rule of equality, but it may lawfully classify property for the purposes of taxation, and impose different rates on different classes; it being sufficient if there is no discrimination in favor of one as against another of the same class, and the method of assessment and collection of the tax is not inconsistent with natural justice.

**4. TAXATION OF RAILROADS—POWER OF STATES—CONSTITUTIONALITY OF METHOD OF TAXATION.**

Article 14, § 10, of the Constitution of Michigan, as amended in 1900, authorizes the Legislature to provide for the assessment of the property of corporations at its true cash value by a State Board of Assessors, and for the levying and collection of taxes thereon. It requires the Legislature to provide a uniform rule of taxation for all property so assessed, and that the rate of taxation shall be the rate which the State Board of Assessors shall ascertain and determine is the average rate levied upon other property upon which ad valorem taxes are assessed for state, county, township, school, and municipal purposes. Act No. 173, p. 236, Pub. Acts 1901, enacted pursuant to such constitutional provisions, provides for the assessment and taxation of the property of railroad and similar corporations by the State Board of Assessors, and that they shall ascertain and determine the average rate of taxation of other property by means of reports of the action of local taxing bodies, and that the taxes, when collected, shall be applied to certain state purposes. *Held,* that such laws were not unconstitutional, as depriving the corporations of their property without due process of law, or denying them the equal protection of the laws, on the ground that the rate of taxation was not determined and fixed by the Legislature, but that it was in fact fixed by the Constitution and the Legislature; the determination of the rate by the State Board of Assessors being clerical only, and the method of fixing it from the average rate of state and local levies for the current year being not only legal and within the legislative discretion, but also equitable.

**5. SAME.**

Such statute (Act No. 173, p. 236, Pub. Acts Mich. 1901) is not in violation of article 14, § 14, of the state Constitution, which provides that "every law which imposes * * * a tax shall distinctly state the tax and the object to which it is to be applied," nor is it objectionable because it provides for no hearing as to the rate before the tax is imposed, since, the rate being fixed by the Constitution, and the duty of the State Board of Assessors being merely to ascertain it by a mathematical calculation, such board has no discretion to change it.

**6. SAME.**

A state statute is not in violation of the fourteenth constitutional amendment, as denying the equal protection of the laws, because it provides a method of taxing the property of railroad corporations different from that applied to the property of other corporations or individuals, although the latter may incidentally own or operate railroads; the fact that railroad corporations, as such, are vested with different and greater powers than other corporations or individuals, being a sufficient reason for their separate classification for purposes of taxation.

**7. SAME.**

A statute providing a method of taxation of a particular class of property different from that applied to other classes is not invalid, as in violation of the rule of uniformity of taxation imposed by the state Constitution, because it does not provide for equalizing the valuation of such class with other classes, where all the statutes require assessments to be made at actual value, and thus provide for uniformity if faithfully administered.

**8. SAME.**

Under the well-established rule that a state has power to provide for the taxation of different classes of property by different methods, a statute providing a special method of taxing the property of railroad corporations is not unconstitutional, as denying such corporations the equal protection of the laws, because it taxes their property, including credits, at its cash value as a unit, while other statutes, providing for the taxation of individuals, permit the deduction of indebtedness from credits.

**9. SAME—ENJOINING COLLECTION OF TAX—INEQUALITY IN ASSESSMENT.**

The collection of a tax levied against the property of railroad companies on an assessment at its actual value cannot be enjoined on the ground that other property in the state was assessed at less than its actual value, in violation of the statute, unless it is shown that such undervaluation was fraudulent, intentional, and systematic.

## In Equity. Suits to enjoin collection of taxes.

Until the legislation complained of in these cases, railroad corporations, express companies, car loaning companies, etc., were taxed in the state of Michigan specifically upon their gross earnings. For the purpose of enabling the Legislature to pass an act for their taxation by an ad valorem system of assessment, placing their property for that purpose upon the same basis with that of other corporations and individuals throughout the state, the Constitution was amended in 1900. The amendment permitted the Legislature to provide for the assessment of the property of corporations at its true cash value by a State Board of Assessors, and provided for a uniform rule of taxation for such property, and that the rate of taxation on such property should be the rate which the State Board of Assessors should ascertain and determine as the average rate levied upon other property on which ad valorem taxes are assessed for state, township, county, school and municipal purposes. At the next session of the Legislature, in 1901, Act No. 173 (page 236), was passed,[1] which is entitled "An act to provide for the assessment of the property of railroad companies, union station and depot companies, express companies, car loaning companies, stock car companies, refrigerator car companies and fast freight line companies; and for the levying of taxes thereon by the State Board of Assessors, and for the collection of such taxes," under the provisions of which act the companies affected were required to make reports to the State Board of Assessors, which board was required to prepare an assessment roll and assess the property of such corporations, the property of the several corporations being described thereon by a general statutory description, which in the case of the railroad companies was required to be "real estate, rolling stock, right of way and appurtenances thereto, and all other property used in carrying on the corporate business, and subject to taxation by the State Board of Assessors." In determining the true cash value of the property of the railroad companies, it is provided that the board should be guided by the relation which the number of miles of main track within the state of Michigan bears to the entire mileage of the main track of said companies, both within and without the state. After the completion of such roll the Board of Assessors is required to meet at the state capitol at Lansing on the third Monday of December of each year, and continue in session from day to day for so long a period as may be necessary, not later than the 15th day of January next thereafter, for the purpose of reviewing their assessment; and any company or persons interested shall have the right to appear during such period and be heard as to the valuation of the property of any such company, and the State Board of Assessors, on such application, or on its own motion, is given authority to correct the assessment or valuation of the property of such company in such manner as will, in its judgment, make the valuation thereof just and equal. It is made the duty of the clerk of the board of supervisors in each county in the state, not later than the 1st day of November in each year, to report to said board the equalization made by the board of supervisors of the assessment rolls of the several townships therein, which report shall contain a statement of the amount of ad valorem taxes to be raised in the several municipalities in such county for state, county, township, municipal, school, and other purposes, and a statement of the correct valuation of the property in each of said municipalities, as taken from the assessment rolls of said municipalities for the year in which such equalization is made. It is made the duty of the supervisor or other as-

---

[1] Note.—Copies of the amendments to the Constitution and of Act No. 173, p. 236, of 1901, are attached to this opinion.

sessing officer of cities and villages governed by special charters, which pro-
vide for the collection of ad valorem taxes, which are not reported to the
board of supervisors for the purpose of equalization or review, and the su-
pervisors or other assessing officers of cities organized under general laws,
to make within said time a report to said board of all ad valorem taxes
raised in any of such municipalities which have not been reported to the
State Board of Assessors, for the purpose of equalization and review. The
act further provides, in section 12 (page 245), that after the receipt of such
reports, and not later than the 15th day of December in each year, the State
Board of Assessors shall ascertain and determine the average rate of taxa-
tion of the then current year levied upon other property upon which ad
valorem taxes are assessed for state, county, township, school, and municipal
purposes, and shall enter the same upon its record forthwith, together with
the method by which such average rate was ascertained and determined.
The board is required to tax the property of the several companies, as as-
sessed by it, at the rate as determined, and the amount of the taxes is to
be extended upon the assessment roll, opposite the description of the respec-
tive companies' properties. The taxes so extended are made a debt owing
from the companies, and become a lien upon all of the property, real, per-
sonal, and mixed, of said companies, from the time of extension until pay-
ment, which lien may be enforced by seizure and sale of the property, or
so much thereof as is necessary to satisfy the same. The board is required
to annex to its roll its warrant commanding the Auditor General to collect
said sums, which warrant is authority, in case of the neglect or refusal of
any company to pay its tax, for levying on the same by distress and sale
of the property of the corporation. All taxes collected under the act are
to be applied in paying the interest upon the primary school, university,
and other educational funds, and the interest and principal of the state debt,
in the order recited, until the extinguishment of the state debt, other than
the amounts due to educational funds, when such taxes shall be added to,
and constitute a part of, the primary school interest fund.

The State Board of Assessors proceeded under the act for the collection
of the taxes for the year 1902, assessing the property of the companies at
what they believed to be its true cash value. Acting under the provisions
of section 12 of the act, to ascertain and determine the average rate of taxa-
tion for the year 1902 levied upon other property upon which ad valorem
taxes were assessed for state, county, township, school, and municipal pur-
poses, they believed it to be their duty to determine whether such other
property had been assessed at its true cash value, and proceeded accordingly,
and did ascertain and determine that such property had not been assessed
by the assessors thereof at its true cash value, but that it had been assessed
at a sum greatly less than its true cash value, and determined the true
cash value of such property to be the sum of $1,715,000,000, making thereby
the amount of the assessed valuation of said property as determined by
them greater than the amount of valuation as assessed by the local asses-
sors, as shown by the reports made to said board by the clerks of the boards
of supervisors; and by such determination the board ascertained and de-
termined the rate of taxation to be levied upon the properties of said com-
panies to be $13.68905 per $1,000 of the assessed valuation thereof, and levied
said rate of taxation upon the property of said companies. The tax roll made
upon that basis, with the proper warrant of the board, was delivered to the
Auditor General for collection. Thereupon application was made to the Su-
preme Court of the state by the board of education of the city of Detroit for
a writ of mandamus to said State Board of Assessors, to require them to
redetermine the rate of taxation to be levied upon the property of said com-
panies, by taking for such determination the assessed value of the other
property as the same had been made by the local assessors. The Supreme
Court granted the writ of mandamus; holding that under the provisions of
said Act No. 173 the State Board of Assessors had no authority to thus
equalize the assessment of said other property, and that their duty in deter-
mining the rate of taxation to be levied upon the property of said companies
was to take the valuation of said other property at the assessment made
thereof by the local assessors. Board of Education v. State Board of As-

sessors, 133 Mich. 116, 94 N. W. 668. Acting under the direction of the Supreme Court, the State Board of Assessors redetermined the rate of taxation levied upon said other property for state, county, township, school, and municipal purposes on the basis of the said assessment of said property made by the local assessors, and thereby made the rate of taxation to be levied upon the property of said companies $16.55329 per $1,000 upon the said assessed valuation thereof. For such tax a new assessment roll was made by said board, with its proper warrant annexed thereto for the collection of said tax, and delivered to the Auditor General.

To stay the collection of those taxes these suits are brought, in which complainants allege that the general properties of the state, other than railroad property, upon which taxes were assessed for state, county, township, school, and municipal purposes, were assessed at less than the true and actual cash value, and at about 82 per cent. thereof; that unincorporated persons, associations, partnerships, and joint-stock associations possess and operate railroads in Michigan, and own property similar in character and engaged in the same business and owned under the same circumstances as the railroad property of the complainants; that railroad companies, among whom were some of the complainants, operate sleeping cars, and that sleeping cars were also operated by corporations or institutions independent of railroads; that interurban and street railways and their property are engaged in the same business as complainants.

The defendant filed answers to the bills of complaint, which deny all statements setting up the unconstitutionality and invalidity of the constitutional amendments and Act No. 173, p. 236, of 1901, and the system of taxation invoked thereby, and, in addition, set forth in denial of allegations of the bills that the general properties of the state, upon which ad valorem taxes are assessed for state, county, township, school, and municipal purposes, were not assessed at less than their true and actual cash value, but were for 1902 presumptively, conclusively, and actually assessed at their true and actual cash value, and further setting forth that the properties of the complainant companies, as assessed by the State Board of Assessors, pursuant to Act No. 173 for the year 1902, were assessed at much less than the true and actual cash value thereof. The answers also denied the allegations of the bills in regard to sleeping car companies and interurban and street railway companies, and as to railroad and similar property to that owned and operated by complainants, being owned by unincorporated persons or institutions not subject to taxation under Act No. 173.

The objections interposed by the complainants to the system of taxation of railroads invoked by the Constitution and statute, as stated in their bills of complaint are that it violates:

(a) The fourteenth amendment to the federal Constitution in that: (1) The selection, of the corporations subject to taxation by a State Board of Assessors by said act is arbitrary, not based on material and inherent differences in the corporations taxed or their property from other corporations and property, and does not constitute proper classification for purposes of taxation. (2) While individuals and corporations generally are entitled under the general laws of the state to have their bona fide debts deducted from their credits, no such provision exists and no such deduction is allowed in the case of complainants. (3) A higher rate of taxation is imposed on the property of complainants than upon the property of other corporations and persons claimed to be similarly situated. (4) The rate of taxation to which complainants are subject is dependent on the action of local officers, over whom complainants have no control, before whom they cannot be heard, and whose action they have no right to have reviewed in the courts, or otherwise. (5) The rate is fixed without legislative judgment as to the need of the funds benefited by the tax in any year. (6) The act operates to impose a tax upon the property of complainants situate in other states. (7) No opportunity is given complainants for a hearing upon the determination of the State Board of Assessors in fixing the average rate. (8) By neglecting to provide for equalization of the property of corporations taxed under Act No. 173 with other property of the state, the fourteenth amendment of the federal Constitution is violated, and equal protection of the laws denied.

(9) As complainants had no notice of, or opportunity to be heard upon, the redetermination of the average rate, in the preparation of the duplicate assessment roll and the spreading of the tax thereon, due process of law was denied. (10) The constitutional provision and statute deprive complainants of their property without due process of law. (11) In requiring other tax laws to state distinctly the tax and its object, and not making a similar requirement as to acts providing for the taxation of corporations by a State Board of Assessors, discrimination results. (12) In that every other law which imposes a tax on property in the state of other corporations, companies, associations, and persons is required to state distinctly such tax and its object, while Act No. 173 does not state distinctly the tax it imposes. (13) By reason of the fact that the other property of the state, subject to ad valorem assessment for taxation for state, county, township, school, and municipal purposes, the average rate imposed upon which throughout the state is determined by the State Board of Assessors by mathematical computation, by dividing the aggregate amount of taxes levied and raised for the purposes enumerated by the aggregate assessed valuation of such other property at which average rate taxes are levied upon the assessed value of the property of complainants as fixed by the State Board of Assessors, is not assessed at its true and actual cash value, but at only about 82 per cent. thereof, while the property of complainants is assessed at its true and actual cash value, a discrimination results against complainants.

(b) That it violates section 8 of article 1 of the United States Constitution, in attempting to regulate commerce among the several states.

(c) That it violates section 4 of article 4 of the United States Constitution, guarantying to every state a republican form of government.

(d) That Act No. 173 violates sections 10 and 11 of article 14 of the Michigan Constitution: (1) In that the selection of the corporations subjected to taxation by a State Board of Assessors by said act is arbitrary, is not based on material and inherent differences in the corporations taxed or their property from other corporations and property, and does not constitute proper classification for purposes of taxation. (2) In not giving complainants a hearing on the question of the rate of taxation to be imposed upon their property. (3) In including within its provisions the property of the corporations named in the act, to the exclusion of all other corporations in the state. (4) In not providing a rule of taxation uniform, except on property paying specific taxes, by not permitting the deduction of complainants' debts from their credits, while permitting that deduction to other property owners. (5) In that if Act No. 173 is susceptible of the inclusion of highway taxes in the dividend in reaching the average rate, it violates section 11 of article 14.

(e) That Act No. 173 violates the provisions of section 32 of article 4 of the Michigan Constitution, in giving no right of hearing to complainants upon the question of the rate of taxation to be imposed upon their property.

(f) That Act No. 173 violates the provisions of section 12 of article 14 of the Michigan Constitution, requiring all assessments to be on property at its cash value, in not permitting the corporations taxed thereunder to deduct their debts from their credits, as permitted to property owners generally.

(g) Said act violates section 14 of article 14, providing that every law which imposes, continues, or revives a tax shall distinctly state the tax and the objects to which it is to be applied, and that it shall not be sufficient to refer to any other law to fix such tax or object.

(h) That Act No. 173 is repugnant to the Michigan Constitution, in authorizing the imposition of taxes upon complainants without the exercise of legislative judgment on the rate of taxation to be imposed, or the need of the state of the amount of money required for the purposes to which the proceeds of said tax are to be devoted. (1) That the Board of Assessors, in reaching the average rate, included in the dividend taxes for other than state, county, township, school, and municipal purposes.

Frederick W. Stevens (Benton Hanchett, of counsel), for Pere Marquette R. Co.

O. E. Butterfield, for Detroit & M. R. Co.

O. E. Butterfield, R. C. Flanigan, and Lloyd W. Bowers (J. H. Krebs, of counsel), for Chicago & N. W. Ry. Co.

E. W. Meddaugh and Harrison Geer (L. C. Stanley, of counsel), for Toledo, S. & M. Ry. Co., Michigan Air Line Ry. Co., Grand Trunk Western Ry. Co., Cincinnati, S. & M. R. Co., and Chicago, D. & C. Grand Trunk Junction R. Co.

O. E. Butterfield and Henry Russel (Ashley Pond, of counsel), for Michigan Cent. R. Co.

Alexander L. Smith, for Ann Arbor R. Co.

Hill & Smith (William P. Belden, of counsel), for Munising Ry. Co., Lake Superior & I. Ry. Co., and Marquette & S. E. Ry. Co.

Hill & Smith (Burton Hanson, of counsel), for Chicago, M. & St. P. Ry. Co.

A. E. Miller (A. B. Eldredge, of counsel), for Mineral Range R. Co.

John H. Patterson, for Pontiac, O. & N. R. Co.

E. C. Chapin (Alfred H. Bright, of counsel), for Minneapolis, St. P. & S. S. M. Ry. Co.

Gray & Stone (A. R. Gray, of counsel), for Copper Range R. Co.

Howard Morris (Thomas H. Gill, of counsel), for Gogebic & M. R. R. Co.

Dovel & Smith, for Manistee & N. E. R. Co.

Charles C. Russell (Horace A. J. Upham, of counsel), for Escanaba & L. S. R. Co.

T. J. O'Brien, for Grand Rapids & I. Ry. Co.

E. C. Eastman (Jesse B. Barton, of counsel), for Wisconsin & M. Ry. Co.

Charles A. Blair, Loyal E. Knappen, Charles E. Townsend, and Timothy E. Tarsney (Roger Irving Wykes, of counsel), for Auditor General.

WANTY, District Judge, after making the foregoing statement, delivered the opinion of the court.

The defendant objects to any consideration of these cases because he says they are brought to restrain the collection of taxes levied by the state of Michigan, and, although brought against him as Auditor General, they are in effect suits against the state, of which the court has no jurisdiction. The jurisdiction of the court to restrain the collection of taxes, where the bill in good faith alleges that the Constitution and statute of Michigan under which the tax in question was levied are repugnant to the Constitution of the United States, and that the defendant, who is the Auditor General, by his acts under that Constitution and statute, which, it is claimed, deny to the complainants the equal protection of the laws, is about to deprive the complainants of their property without due process of law, could hardly be seriously questioned, after the repeated declarations of the Supreme Court, either on the ground that the suit is against the state, or on the ground that a federal question is not involved. Pennoyer v. McConnaughy, 140 U. S. 1–10, 11 Sup. Ct. 699, 35 L. Ed. 363; Ex parte Tyler, 149 U. S. 164–190, 13 Sup. Ct. 785, 37 L. Ed. 689; Scott v. Donald, 165 U. S. 58–

68, 17 Sup. Ct. 265, 41 L. Ed. 632; Tindall v. Wesley, 167 U. S. 204–220, 17 Sup. Ct. 770, 42 L. Ed. 137; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Prout v. Starr, 188 U. S. 537–542, 543, 23 Sup. Ct. 398, 47 L. Ed. 584.

But it is seriously contended by the defendant that if the federal questions which are raised by the bills, which it is conceded are not fictitious, and which gave the court jurisdiction, are decided against the complainants, although the court had jurisdiction to dispose of these questions, its jurisdiction immediately ceases, and it may not decide the question of the undervaluation of the property of the state which is not taxed under the statute in question, when compared with the valuation placed upon the property of the complainants which is so taxed. Of course, if the claim that the Constitution and statute of the state violate the Constitution of the United States is fictitious and fraudulent, the Circuit Court of the United States could not acquire jurisdiction; but if that claim is real, and the court acquires jurisdiction, it does not lose it because its decision on that question is against the complainants' contention. If this were not so, all bills for injunction, in which the jurisdiction of the federal court is invoked on account of a statute or Constitution of a state contravening the provisions of the federal Constitution, should be disposed of without putting the parties to the expense of taking testimony, because no testimony could possibly be considered. If it were found that the contention of the complainants was well founded, then an injunction would follow as a matter of course; and if it were found that the Constitution or statute did not violate the provisions of the federal Constitution, the jurisdiction of the court would immediately determine, and the bill be dismissed. If that contention is well founded, then in these cases two years of time, and many thousands of dollars spent in taking testimony, should have been saved. But we cannot assent to this view. If the court actually acquires jurisdiction, that jurisdiction, although acquired because the Constitution or law of a state is claimed to be in contravention to the Constitution of the United States, extends to all questions involved in the controversy, and not merely to the question of the violation of the federal Constitution. Jurisdiction of a federal court having been properly invoked for relief against assessments as discriminating against complainant, and thus depriving it of the equal protection of the laws, under the fourteenth amendment, where the complainant fails to show discrimination the bill may be retained to administer relief on other grounds, although the state court could afford adequate remedy. This was held in Louisville Trust Co. v. Stone, 107 Fed. 305, 46 C. C. A. 299, where Justice Day, in delivering the opinion of the Circuit Court of Appeals of this circuit, cites with approval the case of Nashville, etc., Railway Co. v. Taylor (C. C.) 86 Fed. 168, in which the grounds of federal jurisdiction are carefully examined and fully stated in an able opinion by Judge Clark. Where the Supreme Court of the United States acquires jurisdiction on appeal from this court only because a law of a state is claimed to be in contravention of the Constitution of the United

States, the appeal is not dismissed because the Supreme Court decides that the claim of the federal question involved is not well founded. If the claim is real and is made in good faith, then the Supreme Court acquires jurisdiction of the entire case, and of all questions involved in it.

In the case of Horner v. United States, 143 U. S. 570, 576, 577, 12 Sup. Ct. 522, 524, 36 L. Ed. 266, the court said:

"We are further of opinion that where an appeal or writ of error is taken direct to this court under section 5 of the act of March 3, 1891, in a case in which the constitutionality of a law of the United States is drawn in question, this court acquires jurisdiction of the entire case, and of all questions involved in it, and not merely of the question of the constitutionality of the law of the United States. This is shown by the fact that, under section 5, where an appeal or writ of error is taken direct to this court in a case in which the jurisdiction of the District Court or of the Circuit Court is in issue, it is specifically directed that 'the question of jurisdiction alone shall be certified to the Supreme Court from the court below for decision,' but there is no kindred limitation prescribed in regard to any of the other cases in which jurisdiction in this court of appeals or writs of error is given by section 5."

In Penn Mutual Life Insurance Co. v. Austin, 168 U. S. 685–695, 18 Sup. Ct. 223, 227, 42 L. Ed. 626, Mr. Justice White, delivering the opinion of the court, said:

"But the words of the statute which empower this court to review directly the action of the Circuit Court are that such power shall exist wherever it is claimed on the record that a law of a state is in contravention of the federal Constitution. Of course, the claim must be real and colorable, not fictitious and fraudulent. The contention here made, however, is not that the bill, without color of right, alleges that the state law and city ordinances violate the Constitution of the United States, but that such claim as alleged in the bill is legally unsound. The argument, then, in effect, is that the right to a direct appeal to this court does not exist where it is claimed that a state law violates the Constitution of the United States, unless the claim be well founded. But it cannot be decided whether the claim is meritorious and should be maintained without taking jurisdiction of the case. The authorities referred to as supporting the position indicate that the argument is the result of a confusion of thought, and that it arises from confounding the power of this court to review on a writ of error the action of a state court with the power exercised by this court, under the act of 1891, to review by direct appeal the final action of the Circuit Court, where, on the face of the record, it appears that the claim was made that the statute of a state contravened the Constitution of the United States. These classes of jurisdiction are distinct in their nature, and are embraced in different statutory provisions. Having jurisdiction of the cause, there exists the power to consider every question arising on the record."

The case of Coulter v. Louisville & Nashville R. Co. (decided by the Supreme Court of the United States February 20, 1905) 196 U. S. 599, 25 Sup. Ct. 342, 49 L. Ed. 615, was a bill brought by a Kentucky railroad corporation against the members of the State Board of Valuation and Assessment of Kentucky, and the only ground of jurisdiction alleged was that under the laws of the state of Kentucky, as administered by its executive officers, the railroad company was deprived of the equal protection of the laws, contrary to the fourteenth amendment to the federal Constitution, because all property not exempt from taxation was required to be assessed at its fair cash value, and the assessing officers assessed a great

deal of the tangible property in the state below its cash value, and the complainants' railroad property was assessed at its full value. After deciding the federal question, which gave the court below jurisdiction, adversely to the complainants' contention, the court then examined the evidence, and decided the question of fact involved in the case on its merits, saying that:

"As the claim of right under the United States Constitution was not merely colorable, and as the evidence is here, we have considered the evidence, also; and our conclusion from that, as well as from the law, is that the bill must be dismissed."

The objections of complainants to the amendment of the Michigan Constitution and the statute under which the taxes in these cases were levied are repeated in different forms in the bills of complaint, but may be grouped under a few heads; and those serious and important questions thereby raised, and which were argued in the briefs of counsel, and orally at the bar, we will examine. In examining and deciding each of these questions, we shall not at any time forget that the taxing power of a state is necessary to its existence, and, being one of its attributes of sovereignty, a statute passed for the levy and collection of its revenue must not be held void by a federal court unless it is so clearly an illegal encroachment upon private rights as to leave no doubt of its invalidity.

The complainants complain that the provision of the fourteenth amendment to the Constitution of the United States forbidding the state to deprive any person of his property without due process of law, or to deny to any person within its jurisdiction the equal protection of the laws, is violated by the amendment to the Constitution of the state of Michigan, and the statute made in pursuance thereof, under which the taxes in question in these cases were levied. As has been many times said by the Supreme Court, it was undoubtedly intended by the fourteenth amendment that no state should arbitrarily deprive any person of his property, and that equal protection and security should be given to all under like circumstances. No rule can be stated which will cover all cases, but the law must give the same protection to all persons in like condition, and impose no greater burden upon one than it does upon all others under similar circumstances. This protection extends to discrimination in laws for the levy and collection of taxes, as well as to all other legislation of a state; but perfect equality and uniformity in taxation is unknown, and an effort to obtain it as near as possible is the most that legislative wisdom can accomplish.

There can at this time be no question, after the frequent and uniform expressions of the federal Supreme Court, that it was not designed by the fourteenth amendment to the Constitution to prevent a state from changing its system of taxation in all proper and reasonable ways, nor to compel the states to adopt an iron rule of equality, to prevent the classification of property for purposes of taxation, or the imposition of different rates upon different classes. It is enough that there is no discrimination in favor of one as

against another of the same class, and the method for the assessment and collection of the tax is not inconsistent with natural justice. Bell's Gap R. Co. v. Pennsylvania, 134 U. S. 232, 10 Sup. Ct. 533, 33 L. Ed. 892; Giozza v. Tiernan, 148 U. S. 657–662, 13 Sup. Ct. 721, 37 L. Ed. 599; Adams Express Co. v. Ohio, 165 U. S. 194–228, 17 Sup. Ct. 305, 41 L. Ed. 683; Magoun v. Illinois Trust & Savings Bank, 170 U. S. 283, 18 Sup. Ct. 594, 42 L. Ed. 1037; Billings v. Illinois, 188 U. S. 97, 23 Sup. Ct. 272, 47 L. Ed. 400; Merchants' & M. Bank v. Pennsylvania, 167 U. S. 461, 17 Sup. Ct. 829, 42 L. Ed. 236; Kentucky Railroad Tax Cases, 115 U. S. 321, 6 Sup. Ct. 57, 29 L. Ed. 414; Home Insurance Co. v. New York State, 134 U. S. 594, 10 Sup. Ct. 593, 33 L. Ed. 1025; Gulf, etc., Ry. Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666; Clark v. Titusville, 184 U. S. 329, 22 Sup. Ct. 382, 46 L. Ed. 569; American Sugar Refining Co. v. Louisiana, 179 U. S. 89, 21 Sup. Ct. 43, 45 L. Ed. 102; New York State v. Barker, 179 U. S. 279, 21 Sup. Ct. 124, 45 L. Ed. 194; Charlotte, etc., R. Co. v. Gibbes, 142 U. S. 386, 12 Sup. Ct. 255, 35 L. Ed. 1051; Travelers' Ins. Co. v. Connecticut, 185 U. S. 364, 22 Sup. Ct. 673, 46 L. Ed. 949; Kidd v. Alabama, 188 U. S. 730, 23 Sup. Ct. 401, 47 L. Ed. 669; Turpin v. Lemon, 187 U. S. 51, 23 Sup. Ct. 20, 47 L. Ed. 70; Florida, etc., R. Co. v. Reynolds, 183 U. S. 471, 22 Sup. Ct. 176, 46 L. Ed. 283.

It is urged by complainants that due process of law requires, in taxation, that the tax be levied by a legislative body which is chosen by and acts for the community that includes the person or contains the property taxed, which is not provided for by the amendment to the Michigan Constitution or the statute under consideration; that a protection is furnished to other taxpayers of the state by the laws which provide a legislative determination or judgment of the amount of taxes which ought to be imposed upon them, which determination or judgment is formed upon the consideration of the needs of the state or of the municipality for which the taxes imposed are to be devoted, and the amount of the taxation required to provide for such needs, while such protection is withheld from the companies subjected to taxation under the act in question; that the determination of the amount of taxes to be raised in any case or for any purpose is a legislative determination; that taxes for state purposes are determined by the Legislature, taxes for municipal purposes are determined by the boards, officials, or assembly upon whom is conferred by the state the legislative power to decide for what purpose and in what amount taxes may be raised; that in every case it is a legislative determination made in view of the public interests, and of the amount of taxes required for those interests, and this legislative power is exercised by officers chosen by or answerable to those directly interested in the district to be taxed; that the taxes here levied upon the railroad companies are strictly state taxes, imposed for state purposes, yet the Legislature does not determine the amount of the tax, nor is it determined by any legislative action which considers the subject of the tax; that the Legislature directs the amount of the complainants' taxes to be determined by the various county, township,

city, village, and school district electors, boards, councils, and officers, who, in their action by which the amount of the taxation of the railroads is determined, take no account, and can take no account, of the needs of the public in respect to the purposes to which the taxes are to be devoted; that the determination of the amount of the taxes to be paid by the railroad companies is not only arbitrary, but that it is the result of chance, arising out of conditions, circumstances, and actions which have no relation whatever to the objects or purposes for which the taxes are imposed upon the railroad companies.

If this is the provision of the constitutional amendment and legislation of the state of Michigan under consideration, in these cases there can be no doubt of its conflict with the fourteenth amendment of the federal Constitution. Chief Justice Marshall said of the power of taxation, in McCulloch v. Maryland, 4 Wheat. 427, 4 L. Ed. 579:

"The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax the Legislature acts upon its constituents. This is, in general, a sufficient security against erroneous and oppressive taxation."

And again, in Providence Bank v. Billings, 4 Pet. 561, 7 L. Ed. 939, he said:

"This vital power may be abused, but the Constitution of the United States was not intended to furnish the corrective for every abuse of power which may be committed by the state governments. The interest, wisdom, and justice of the representative body, and its relations with its constituents, furnish the only security, where there is no express contract, against unjust and excessive taxation, as well as against unwise legislation generally."

This principle pervades our whole system, and has been reiterated in a multitude of judicial opinions in the federal and state tribunals from the time of Marshall to the present. Let us look at the constitutional amendment and statute of the state against which this criticism is directed, and see what foundation there is for it. The constitutional amendment provides that the Legislature shall provide a uniform rule of taxation for such property as shall be assessed by a State Board of Assessors, and the rate of taxation on such property shall be the rate which the State Board of Assessors shall ascertain and determine is the average rate levied upon other property upon which ad valorem taxes are assessed for state, county, township, school, and municipal purposes. The rate is prescribed by the Constitution and Legislature to be the average rate levied upon other property upon which ad valorem taxes are assessed. The Legislature may use any method to fix the rate, so long as it does not delegate its legislative function; and if the rate had been fixed at any certain percentage, or the average rate assessed upon other property for any year preceding the enactment, no constitutional objection could be urged to it. As was said by the federal Supreme Court in Delaware Railroad Tax Case, 18 Wall. 206–231, 21 L. Ed. 888:

"The state may impose taxes upon the corporation as an entity existing under its laws, as well as upon the capital stock of the corporation or its

separate corporate property. And the manner in which its value shall be assessed, and the rate of taxation, however arbitrary or capricious, are mere matters of legislative discretion. It is not for us to suggest in any case that a more equitable mode of assessment or rate of taxation might be adopted than the one prescribed by the Legislature of the state. Our only concern is with the validity of the tax. All else lies beyond the domain of our jurisdiction."

Then, if the Legislature had the absolute power to fix the rate, what more equitable rate could it have adopted than the average rate paid by the other taxpayers of the state? This seems not to have been a scheme to produce inequality, but a carefully devised scheme to distribute the burdens of taxation equally upon all taxpayers. However, the character of the rate cannot be brought in question here. The only question is, did the Legislature fix it, or is it fixed by the determination of the various legislative bodies of the different taxing districts into which the state is divided? "A rate ascertained as the result of that which is enacted may be regarded as authorized by law, as well as a rate declared in terms." Morton, Bliss & Co. v. Comptroller General, 4 S. C. 477. The local legislative bodies, in determining the amounts to be raised by taxation in their respective jurisdictions, and the assessing boards, in placing a valuation upon the property to be taxed, do not fix the rate, under this statute, to be paid by the complainants. They fix the rate to be paid by their several constituencies who appointed them, and to whom they are responsible; and the state Legislature, which is a body representing the complainants, fixes the rate at which the complainants are taxed to be the average rate placed on the other property of the state, which is ascertained by a mathematical calculation. The rates at which the respective communities are taxed are facts in the production of which the discretion of the officers and the needs of the various communities for which they act is certainly an element, but after the facts are produced the Legislature may take them for its guide in fixing a rate, as it may take any other fact which moves its discretion. If the Legislature were to convene each year after the assessments throughout the state had been levied, and should use the assessment rolls of the various assessing officers for the purpose of ascertaining the average rate levied upon other property upon which ad valorem taxes are assessed, and assess the property of complainants at that rate, there could be no constitutional objection to the tax; and yet the rate will be the same, and it would be ascertained in exactly the same way, except that a committee of the Legislature would do the clerical work of making the mathematical calculation, which, under the statute we are considering, is done by the State Board of Assessors. It seems clear that there is no discretion given to the State Board of Assessors in determining the rate at which the complainants' property is taxed under this statute, but that they perform only a clerical duty in taking the facts evidenced by the various assessment rolls in ascertaining a rate which has been fixed by the Constitution and Legislature.

In Home Ins. Co. v. New York, 134 U. S. 594–600, 10 Sup. Ct. 593, 595, 33 L. Ed. 1025, the court said:

"The validity of the tax can in no way be dependent upon the mode which the state may deem fit to adopt in fixing the amount for any year which it will exact for the franchise. No constitutional objection lies in the way of a legislative body prescribing any mode of measurement to determine the amount it will charge for the privileges it bestows."

And in Maine v. Grand Trunk Ry. Co., 142 U. S. 217–229, 12 Sup. Ct. 121, 122, 35 L. Ed. 994, the court said:

"If the amount ascertained were specifically imposed as the tax, no objection to its validity would be pretended. And if the inquiry of the state as to the value of the privilege were limited to receipts of certain past years, instead of the year in which the tax is collected, it is conceded that the validity of the tax would not be affected; and, if not, we do not see how a reference to the results of any other year could affect its character."

We do not think the method of determining the rate violates the fourteenth amendment to the federal Constitution, because we think the rate is fixed by the Michigan Constitution and Legislature, and not by the local legislatures and assessing officers of the counties, cities, towns, villages, and school districts of the state. Taxation by average rate is not confined to Michigan. See chapter, 64, Pub. St. N. H., in force January 1, 1901; 1 Rev. Laws Mass. 1902, p. 227, c. 12, § 93, c. 14, §§ 37–40; 2 Rev. St. Mo. 1899, pp. 2175, 2176, §§ 9363, 9364; Laws Wis. 1903, pp. 496–499, c. 315, §§ 7–14. In Missouri "the average rate levied in the several school districts" is imposed upon railroads, and it has been sustained as not violating the state or federal Constitution, although the act requires the use, in determining the average rate, of taxes assessed in municipalities in which the railroad has no property. Chicago & Alton R. Co. v. Lamkin, 97 Mo. 496, 10 S. W. 200.

It is urged that the equal protection of the laws is denied to the complainants because section 14 of article 14 of the Constitution of Michigan, which provides that "every law which imposes, continues or revives a tax shall distinctly state the tax and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such tax or object," protects all other taxpayers except the companies taxed under the statute in question. This section has been construed by the state Supreme Court in the case of Walcott v. People, 17 Mich. 68–76, where the act taxing express companies was attacked as not in compliance with the section of the Michigan Constitution above quoted. That statute required the express company to pay into the treasury a specific state tax of 1 per cent. of the gross amount of its current business in the state. The court says:

"It is provided by article 14, § 1, Const., that 'all specific state taxes, except those received from the mining companies of the Upper Peninsula, shall be applied in paying the interest upon the primary school, university, and other educational funds, and the interest and principal of the state debt, in the order herein recited, until the extinguishment of the state debt, other than the amounts due to educational funds, when such specific taxes shall be added to and constitute a part of the primary school interest fund.' It is apparent that the fundamental law has irrevocably prescribed the appli-

cation of all such specific state taxes as that imposed by the act in question, and that the Legislature could in no manner change the purpose or alter the destination of the tax. The application is not only unalterably fixed, but it is specifically defined, and nothing could be added by legislation but an idle repetition of the language of the Constitution. The statute distinctly describes the tax and directs its payment into the state treasury, and the Constitution then takes the subject from the sphere of legislative discretion, and decrees the uses to which the money must be appropriated. It inevitably follows that, by the conjoint operation of the statute and Constitution, the object to which the tax would be applied is made most distinct and certain, and no language in the act could make it more so."

.The Constitution and statute here in question distinctly state that the educational fund referred to in section 1 of article 14 of the state Constitution will need each year the amount to be collected by the taxation of the property referred to in the act, at the average rate which is imposed upon other property upon which ad valorem taxes are assessed. If we are right in what has already been said in regard to the rate being fixed by the Michigan Constitution and Legislature, and not by the local Legislatures of the various assessing districts, then the law distinctly states the tax and the object to which it is to be applied, and does not conflict with section 14 of article 14 of the Constitution of Michigan.

In reply to the objection that no hearing is provided for before the tax is imposed, it is sufficient to say that, if a definite rate were imposed by the Constitution and statute, there could be no reason for granting a hearing, because the result could not be changed; and the Michigan Supreme Court has, in Board of Education v. State Board of Assessors, 133 Mich. 116, 94 N. W. 668, decided that the duty imposed by the Constitution and statute upon the State Board of Assessors, to ascertain and determine the average rate levied on other property upon which ad valorem taxes are assessed, is ministerial and consists of a mathematical calculation. There is, then, no more discretion in the State Board of Assessors than if the rate had been named in the Constitution and statute.

In Hagar v. Reclamation District, 111 U. S. 701, 709, 710, 4 Sup. Ct. 663, 668, 28 L. Ed. 569, the court says:

"Of the different kinds of taxes which the state may impose, there is a vast number of which, from their nature, no notice can be given to the taxpayer, nor would notice be of any possible advantage to him, such as poll taxes, license taxes (not dependent upon the extent of his business), and generally specific taxes on things or persons or occupations. In such cases the Legislature, in authorizing the tax, fixes the amount, and that is the end of the matter. If the tax be not paid, the property of the delinquent may be sold, and he be thus deprived of his property. Yet there can be no question that the proceeding is due process of law, as there is no inquiry into the weight of evidence, or other element of a judicial nature, and nothing could be changed by hearing the taxpayer. No right of his is, therefore, invaded. Thus, if the tax on animals be a fixed sum per head, or on articles a fixed sum per yard, or bushel, or gallon, there is nothing the owner can do which can affect the amount to be collected from him. So, if a person wishes a license to do business of a particular kind or at a particular place, such as keeping a hotel or a restaurant, or selling liquors or cigars or clothes, he has only to pay the amount required by the law, and go into the business. There is no need in such cases for notice or hearing. So, also, if taxes are imposed in the shape of licenses for privileges, such as those on foreign corporations for doing business in the state, or on domestic corporations for

franchises, if the parties desire the privilege, they have only to pay the amount required. In such cases there is no necessity for notice or hearing. The amount of the tax would not be changed by it."

And in Spencer v. Merchant, 125 U. S. 345–354, 8 Sup. Ct. 921, 926, 31 L. Ed. 763, the court says:

"The precise wrong of which complaint is made appears to be that the landowners now assessed never had opportunity to be heard as to the original apportionment, and find themselves now practically bound by it, as between their lots and those of the owners who paid. But that objection becomes a criticism upon the action of the Legislature, and the process by which it determined the amount to be raised and the property to be assessed. Unless by special permission, that is a hearing never granted in the process of taxation. The Legislature determines expenditures and amounts to be raised for their payment, the whole discussion and all questions of prudence and propriety and justice being confided to its jurisdiction. It may err, but the courts cannot review its discretion."

See, also, Fallbrook Irrigation District v. Bradley, 164 U. S. 174, 17 Sup. Ct. 56, 41 L. Ed. 369; Walston v. Nevin, 128 U. S. 582, 9 Sup. Ct. 192, 32 L. Ed. 544; Paulsen v. Portland, 149 U. S. 39, 40, 13 Sup. Ct. 750, 37 L. Ed. 637.

It is contended by the complainants that the classification of their property in the statute under which these taxes are levied is based solely on ownership, and does not include property of the same kind owned by natural persons or corporations which are taxed under the general laws of the state, and therefore denies to complainants the equal protection of the laws. It can hardly be contended, and we do not understand that the complainants seriously urge, that the fourteenth amendment, as applied to railroad corporations, does not permit a separate classification of their property for the purpose of taxation, as that question seems to have been placed, by authoritative decisions, beyond controversy.

In Kentucky Railroad Tax Cases, 115 U. S. 321, 336, 337, 6 Sup. Ct. 57, 63, 29 L. Ed. 414, Mr. Justice Matthews, in delivering the opinion of the court, said:

"The discrimination against railroad companies and their property which is the subject of complaint, as being unjust and unconstitutional, arises from the fact that, in the legislation of Kentucky on the subject, railroad property, though called 'real estate,' is classed by itself, as distinct from other real estate, such as farms and city lots, and subjected to different means and methods for ascertaining its value for purposes of taxation, and differing as well from those applied to the property of corporations chartered for other purposes, such as bridge, mining, street railway, manufacturing, gas, and water companies. These latter report to the Auditor the total cash value of their property, and pay into the treasury as a tax upon each $100 of its value a sum equal to the tax collected upon the same value of real estate; and their reports and valuations are treated as complete and perfect assessments, not subject to revision by any board or court, and conclusive upon the taxing officers. But there is nothing in the Constitution of Kentucky that requires taxes to be levied by a uniform method upon all descriptions of property. The whole matter is left to the discretion of the legislative power, and there is nothing to forbid the classification of property for purposes of taxation and the valuation of different classes by different methods. The rule of equality in respect to the subject only requires the same means and methods to be applied impartially to all the constituents of each class, so that the law shall operate equally and uniformly upon all persons in similar circumstances. There is no objection, therefore, to the discrimination made as between railroad companies and other corporations in the methods and

instrumentalities by which the value of their property is ascertained. The different nature and uses of their property justify the discrimination in this respect which the discretion of the Legislature has seen fit to impose."

Mr. Justice Miller, in State Railroad Tax Cases, 92 U. S. 575–611, 612, 23 L. Ed. 663, where a statute of Illinois made provision for the assessment of the property of railroad companies by a system different from that governing the taxation of other property, which was claimed to violate the provision of the state Constitution requiring uniformity of taxes, and the fourteenth amendment to the federal Constitution, said:

"There can be no doubt that all the classes named in this clause, including peddlers, showmen, innkeepers, ferries, express, insurance, and telegraph companies, are taken out of the general rule of uniformity prescribed by the first clause, and the only limitation as to them is that of uniformity as to the class upon which the law shall operate; that is, innkeepers may be taxed by one, ferries by another, railroads by another, provided that the rule as to innkeepers be uniform as to all innkeepers, the rule as to ferries uniform as to all ferries, and the rule as to railroad companies be uniform as to all railroad companies. As we have seen no evidence that the rule by which railroad property is taxed is not uniform in its action on all the railroad companies of Illinois, we can perceive no opposition to the Constitution of the state in that rule. But suppose it were otherwise; perfect equality and perfect uniformity of taxation as regards individuals or corporations, or the different classes of property subject to taxation, is a dream unrealized. It may be admitted that the system which most nearly attains this is the best. But the most complete system which can be devised must, when we consider the immense variety of subjects which it necessarily embraces, be imperfect."

In Pittsburgh, etc., Railway Co. v. Backus, 154 U. S. 421–425, 14 Sup. Ct. 1114, 1116, 38 L. Ed. 1031, a statute by which all property of individuals and ordinary corporations was subject to valuation and assessment by county officers, while the assessment of railroad property was committed to a State Board of Tax Commissioners, was sought to be held invalid as contravening the provisions of the fourteenth amendment to the federal Constitution. Justice Brewer, in delivering the opinion of the court, said:

"Notwithstanding the elaborate attack made both in brief and argument upon this act, it seems to us that its constitutionality has been practically settled by decisions of this court—especially those in State Railroad Tax Cases, 92 U. S. 575, 23 L. Ed. 663, and Kentucky Railroad Tax Cases, 115 U. S. 321, 6 Sup. Ct. 57, 29 L. Ed. 414. In both of those cases legislation providing for the assessment of railroad property by a state board, while all other property in the state was assessed by county officials, was held to be obnoxious to no provision in the federal Constitution."

In Florida Central, etc., Railroad Co. v. Reynolds, 183 U. S. 471–480, 22 Sup. Ct. 176, 180, 46 L. Ed. 283, a statute of Florida selected for the purpose of reassessment property of railroad companies which had escaped taxation, without at the same time providing for the collection of unpaid taxes on other property. This was objected to as discriminatory and in violation of the fourteenth amendment. The court, after reviewing at length cases construing and determining the application of the fourteenth amendment, held the act valid, saying:

"If the state had subjected railroads to taxation, while exempting some other class of property, it would be difficult to find anything in the four-

teenth amendment to overthrow its action. The mere fact that such legislation may operate with harshness is not of itself sufficient to justify the court in declaring it unconstitutional. These matters of classification are of state policy, to be determined by the state, and the federal government is not charged with the duty of supervising its action."

In Columbus Southern Railway Co. v. Wright, 151 U. S. 470, 14 Sup. Ct. 396, 38 L. Ed. 238, it was held that a provision in a statute of Georgia distributing for taxation purposes the rolling stock and other unlocated personal property of the railroad company, for the benefit of counties traversed by the railroad, instead of taxing the property in the county where the railroad company had its principal office, does not violate the provision in the fourteenth amendment to the Constitution that no state shall deny to any person within its jurisdiction the equal protection of the laws.

In McHenry v. Alford, 168 U. S. 651, 665, 673, 18 Sup. Ct. 242, 42 L. Ed. 614, a specific tax on gross earnings in full of all taxation of land and other property of railroads, it was held, did not deprive other owners of similar lands, taxed upon their value, of equal protection of the laws.

The last expression of the Supreme Court of the United States on this question was in the case of Coulter v. Louisville & Nashville R. Co., supra, in which the question of the state's right to tax the property of corporations in a different class and at a different rate from the other property of the state is disposed of in a single sentence, as follows:

"If it be a fact that the franchise of a Kentucky corporation is taxed at a different rate from tangible property in the state, there can be no question that the state had power to tax it at a different rate, so far as the Constitution of the United States is concerned."

But the complainants contend that in the Michigan statute under consideration a different method is provided for the taxation of railroad property owned by railroad corporations and railroad property owned by individuals and other corporations. It is stated that a number of individuals and manufacturing corporations of the state own and operate railroads chiefly for logging purposes, but incidentally for carrying passengers and freight for hire, and that complainants' property is not legally subject to a different method of taxation than the property of these individuals and manufacturing corporations used in the same business.

The complainants are all incorporated under the statutes authorizing the incorporation of railroad companies, which statutes give to the complainants powers and privileges not enjoyed by any other corporations or individuals. It cannot be said that individuals and corporations which have no right of eminent domain and the various privileges accorded to railroad companies incorporated under the railroad statutes of the state are in the same class with railroad corporations which exercise these rights and privileges. The fourteenth amendment to the federal Constitution permits the legislative power of the state to classify property for the purpose of taxation according to its use by railroad companies which are given these powers and privileges. It is not necessary that all rail-

road property be taxed under one method and at the same rate, but it is only necessary that all property belonging to railroads in the same class be taxed alike. If it is conceded that these logging roads owned by manufacturing corporations or individuals are railroads, they certainly are not railroads of the same class with the complainants. It seems as though it must be as competent for the Legislature to place different classes of railroads in different classes, for the purpose of taxation, as it is to place railroads in a class by themselves, and tax them and their property differently from other persons. Street railroads, which are chartered by the ordinances of various cities, and electric suburban roads, organized under a general statute for that purpose, have different privileges and powers from those given to the roads organized under the general railroad statutes, and those roads built for service in the business in which individuals and manufacturing corporations are engaged have still further restricted powers and privileges; and we can see no reason why, in its discretion, the Legislature may not, for purposes of taxation, place the railroads organized under the general railroad statutes in a class by themselves, leaving the other roads to be taxed under the general laws of the state, without violating the fundamental principles of taxation, or the fourteenth amendment to the federal Constitution. The property of railroad corporations in Michigan has previous to the present act been taxed at a percentage of their gross earnings in lieu of other taxes; and it has never been thought that the property of a lumber company or manufacurer, used in the operation of a private railroad in his business, came within the terms of the statute, or that the statute was unconstitutional because such property was not included.

If we are right in concluding that the property of railroad corporations may lawfully be placed in a class by itself for the purpose of taxation, and be taxed under a method entirely different from that applied to other property, then a fortiori it is not necessary to make provision for the equalization of the assessment of the property so taxed with the other property of the state not so taxed. But it is insisted by the complainants that the Michigan Constitution requires all assessments to be at the cash value of the property assessed, and although it may be legal to provide for the assessment of the property of railroad corporations by a State Board of Assessors, and the assessment of other property of the state by local assessors, in order to have equality there must be an equalization of all the assessments, so that the property not assessed at its cash value may not pay a greater or less proportion than property so assessed. The Constitution of Michigan provides that all property paying ad valorem taxes shall be assessed at its cash value, no matter by what board or officers the assessment is made; and if the officers who make the assessments do their duty, as the law presumes they do, there is necessarily an equalization in the assessments. The argument at the hearing was founded on the presumption that there is and always has been in the state of Michigan a systematic violation of the requirements of the laws in this regard,

138 F.—16

and that an equalization is necessary, so that all property may be assessed, not at its cash value, but at its relative proportion to its cash value when compared to the assessments placed on the other property in the state. Statutes cannot be declared invalid on the ground that the officers acting under them fail to perform the duty which the statutes impose. If the complainants have been discriminated against by a systematic and fraudulent failure on the part of the assessing officers to perform their duty, they may seek relief in a court of equity from the excessive burden placed upon their property by such failure; but the relief is from the misconduct of officers acting under valid statutes, and not from statutes which work injustice only when violated.

It is unnecessary to cite other authorities on this question, when it has been settled by the Supreme Court of the United States in the case of Cummings v. Bank, 101 U. S. 153–160, 161, 25 L. Ed. 903, where, speaking for the court, Justice Miller said:

"We thus see that one board of equalization has charge of the valuation of the real estate of the whole state once in every ten years, another has charge of the valuation of railroad property every year, and a third has charge of the valuation of shares of incorporated banks every year, and the amount fixed by these state boards is in every instance the final basis of taxing that species of property for state and county purposes. We are asked to decide that, as to this final board of equalization of bank shares, whose function is to equalize the valuation of those shares, as among themselves, throughout the state, with no power to consider the valuation of real estate which comes before another board only once in ten years, or other personal property and invested capital which never comes before any state board, that its operations must necessarily produce inequality in · valuation as it regards other property, and is therefore void, as in conflict with the state constitutional rule of uniformity, and with the third section of the same article of the Constitution, declaring 'that all property employed in banking shall bear a burden of taxation equal to that imposed on the property of individuals.' But there are two reasons why we cannot ˙so hold: First, it might be that in every instance the result would be the valuation of bank shares at a lower ratio in proportion to its real value than that of any other property, and therefore plaintiff would have no ground of complaint; and, secondly, what is more important, if these original valuations and equalizations are based always, as the Constitution requires, on the actual money value of the property assessed, the result, except as it might be affected by honest mistakes of judgment, would necessarily be equality and uniformity, so far as it is attainable. So that while it may be true that this system of submitting the different kinds of property subject to taxation to different boards of assessors and equalizers, with no common superior to secure uniformity of the whole, may give opportunity for maladministration of the law, and violation of the principle of uniformity of taxation and equality of burden, yet it is not the necessary result of these laws, or of any one of them: and a law cannot be held unconstitutional because, while its just interpretation is consistent with the Constitution, it is unfaithfully administered by those who are charged with its execution. Their doings may be unlawful, while the statute is valid."

It is urged by complainants that the act in question denies ·to them the equal protection of the laws, because, under the general laws of Michigan, in the assessment of personal property, debits are required to be deducted from credits, while this statute requires the credits of complainants to be taxed at their cash value, without any deduction of indebtedness owed by them; making a different rule of valuation, for which no just reason exists. Again, the right

of the state to make a classification by which railroad property may be lawfully taxed by a different method from that under which other property is taxed becomes important. If the conclusion we have reached in examining the cases upon this question is correct, then all railroad property, including credits, may be taxed under a different method from that applied to other property. If the credits are a part of the railroad property, used in the railroad business, it must be permissible to place them, for purposes of taxation, with the other railroad property in the state, in a separate class. The act under which these assessments were made provides that the description of the property upon the assessment roll may be "real estate, rolling stock, right of way and appurtenances thereto, and all other property used in carrying on the corporate business and subject to taxation by a State Board of Assessors"; and the whole act contemplates the taxation, as a unit, of all the property used in carrying on the railroad business of the railroad company.

In the case of Detroit, Grand Rapids & Western Railroad v. Railroad Commissioner, 119 Mich. 132, 77 N. W. 631, the railroad company claimed that the interest received by it on loans and deposits was not a part of the gross income received in carrying on its business, within the meaning of the statute which provided for the taxation of railroad companies at a percentage of the gross income received in carrying on its business; but the court held that the interest on loans and deposits should be included in the earnings from the railroad business, for the purpose of fixing the taxes.

And in Chamberlain v. Walter et al. (C. C.) 60 Fed. 788-793, Judge Simonton held that:

"A railroad is a unit, every part contributing to its purposes as a whole. If it be a corporation, its corporate purpose is the maintaining a railroad, and all and every part of this property must contribute to this purpose. Its right of eminent domain is limited to this purpose. This unit is made up of lands, personal property, choses in action, easements, all dependent upon and inseparable from each other, deriving their value from this inseparability —from the fact that they contribute to this unit. They differ from every other species of property, and the discrimination made, as between them and other corporations and individuals, in the methods and instrumentality by which the value of their property is ascertained, is not invalid. The mode prescribed by the Legislature of this state is to get at the value of the plant—that is, of all these elements going to make up the railroad—and to ascertain what their combined contributions making up this unit are worth. If they separated the component parts and attempted to fix separate values upon them, they would enter into an impossible task."

In one class properly segregated it would be competent for the state to exempt any part of the property or all of the property, while the same kind of property in another class was made to bear the whole burden of taxation; and a fortiori reducing credits by debits in one class, and not in another, or exempting credits entirely in one class and taxing them in another, does not exceed the power of the state, nor deny the equal protection of the laws. But under the terms of the act in question the credits, as such, are not necessarily taxed, but are taken into consideration by the board, as are all of the other fourteen items in the report of the companies provided to be filed, in determining the cash value of the property as a

whole. If the credits were taken into consideration, and no reduction was made in the value of the property, as a unit, on account of indebtedness which the company was shown to have, and the property was on that account assessed at more than its cash value, then the complainant should have appeared before the board at its meetings provided for by the act, for the purpose of reviewing the roll and correcting the valuation of the property, and had the valuation reduced. But if the statute could be construed to conflict with the general laws of Michigan, and it should be conceded that provision for deduction of debits from credits must be made, the statute would not be rendered void on that account, nor the assessment invalid. If the railroad company had no debts to deduct, it could not be harmed; and, if it had, that fact must be shown, before relief could be asked. Supervisors v. Stanley, 105 U. S. 305, 26 L. Ed. 1044.

We have come to the conclusion, after a careful examination of all of the objections urged against the validity of the constitutional amendment and statute of Michigan under which the taxes in these cases were levied, that they cannot be held to violate the Constitution of the United States; and therefore it is unnecessary for us to discuss the proposition of the defendant claiming that a railroad company, by voluntarily reorganizing under the general railroad law of the state after the adoption of the constitutional amendment and legislation, became subject thereto, and cannot question their validity.

The complainants urge that, if it is ruled that there is no valid objection to the law under which these taxes were levied, the assessments made in the year 1902, by the assessing officers generally, and in a great number of the different and various assessment districts of the state, of the property assessed otherwise than under the act in question, were intentionally made at less than the true cash value of the property assessed, and that the assessments so made did not express the real judgment of the assessing officers making the assessments, and thereby a greater rate and burden of taxation, to the extent of 18 per cent., was put by the State Board of Assessors upon the complainants' property than would have been put thereon if such assessments had been made by the assessing officers as required by law, and that, to the extent of such excess, the collection of taxes based thereon would deprive the complainants of their property without due process of law.

As we have already said, we think the court having jurisdiction of the case, notwithstanding the law has been found to be valid, has the power to examine the evidence and determine this question. In attacking these assessments the complainants must attack the judgment of officers who are by law intrusted with the determination of the value of the property, and the attack can only be effective by proving facts which make out a situation equivalent to fraud. The law is settled, and it seems to be agreed by counsel on both sides, that relief from an undervaluation of the other property of the state must depend upon that undervaluation having been so habitual, systematic, and intentional as to amount

to fraudulent undervaluation. The complainants have shown that there are 1,300 separate assessing districts in the state of Michigan, in which assessing officers prepare assessment rolls for their respective assessment districts. These assessment rolls are submitted to a local board of review, which has authority to change the valuations appearing on the rolls, and the law requires that this property shall be assessed at its true cash value. Under the repeated and almost universal demand for equal taxation, in 1899 the Legislature attempted, by the organization of a board of State Tax Commissioners, with general supervisory power over the local assessors, and authority to change the valuations placed upon the rolls to such an extent as to bring the same up to its judgment of the true cash value, to accomplish that object. The duties of the commissioners were "to take such measures as will secure the enforcement of the provisions of this act, to the end that all of the properties of the state liable to assessment for taxation shall be placed upon the assessment rolls, and assessed at their actual cash value." A table is found in the evidence, made by the Board of State Tax Commissioners after the board was appointed and it had investigated the subject, showing that, in the judgment of the board, the percentage of the value of property as found on the assessment rolls ranged from 22.8 per cent. to 108.7 per cent. of its true cash value, and that there was absolutely no uniformity in the undervaluation or overvaluation of property placed on the rolls. The commissioners attempted to force the assessing officers throughout the state to obey the law requiring them to assess all property for taxation at its true cash value. They endeavored to visit the different portions of the state and interview the assessing officers. They gathered evidence themselves and through employés, and endeavored to determine in what localities the law was being disregarded, and use their best efforts to correct all violations. They conferred with the assessing officers, held meetings with supervisors, and emphasized the importance of listing all property subject to taxation at its true cash value, and pointed out that equal taxation and uniformity of assessment throughout the state can be accomplished in no other way. Wherever they found undervaluations they attempted to correct them, and, if they found any officers who were willfully violating the law in regard to listing property at its true cash value, they in a number of instances prosecuted such officers. The commission found that, in their judgment, few assessments of property had been made at cash value, but they endeavored to correct errors as fast as they found them.

For the year 1902, when the assessed valuation of the property not taxed under the law in question, according to the judgment of the assessing officers, was $1,418,251,858, the tax commission estimated the valuation of the same property at $1,715,000,000. It is on account of the difference between the valuation placed upon this property by the assessing officers of the state and the valuation placed upon it by the tax commission that the complainants claim that the property not taxed under the law in question was assessed

at only 82.4 per cent. of its value. Members of the State Board of Tax Commissioners were placed upon the stand by the complainants, and testified that the old plan of assessing property at a percentage of its value still prevailed in 1902, and that they had made a return to an order to show cause in a suit brought by the board of education of the city of Detroit, heretofore referred to in the statement of this case, in which they stated that the undervaluation of the property of the state, subject to ad valorem taxes for state, county, township, school, and municipal purposes, throughout the state, was not the result of accident, inadvertence, or mistakes in judgment, but that undervaluation of such property was in a large number of municipalities of the state intentional and general, and that this practice of undervaluation had been in vogue in this state for a number of years, which statements they testified were true. The secretary of the board and some of its employés also testified that, in their opinion, the property not taxed under the statute in question was assessed at only a percentage of its cash value. It would take more space than could be allowed to review all of the testimony on this branch of the case, but when the history of the tax commission, as shown in the evidence in this record, is reviewed, it cannot be questioned that they have performed their duties in an energetic and effective manner. In the year 1899, on complaint of members of the commission, a number of the assessing officers were removed for underassessment of property; and that the commission succeeded in correcting a great many assessment rolls where the property had been undervalued previous to the organization of the commission is shown by the fact that the valuation of the properties of the state not taxed under the statute in question in this case was increased from 1899 to 1900 more than $349,000,000 (that is, from $968,169,087 in 1899 to $1,317,450,028 in 1900, an increase of more than one-third); and the aggregate value of the properties of the state not assessed under the statute in question in 1902 was raised to $1,418,000,251.58, making another increase of more than $100,-000,000. If the address of the Governor to the Legislature, before this commission was organized, that the property of the state was assessed at only 65 per cent. of its cash value, was considered extravagant at the time, a justification for the creation of the commission can certainly be found in these figures. The testimony indicates that at the suggestion and solicitation of the commissioners the assessing officers and boards of equalization endeavored to comply with the law, and although, in the judgment of the members of the commission, they have not yet done so, it does not seem from the testimony that there was in 1902 the systematic, intentional, and illegal undervaluation which is necessary before the taxes of those alleged to be discriminated against can be set aside. Whatever the custom might have been previous to 1899 among assessing officers of the state, there certainly is nothing in this record which shows that there is now any general or uniform fraudulent underassessment, and, if the properties appearing on the rolls are underassessed, that conclusion must be reached by substituting the judgment of the members of the tax commission, who were sworn by

the complainants in the case, and their employés, for the judgment of the assessing officers. The testimony shows that the assessing officers, who reside in the districts in which the property is situated, have much better facilities for forming a judgment; and there is no testimony which shows that in the assessment of 1902, as a general rule, their judgments were not honestly formed.

In the case of Louisville & Nashville R. Co. v. Coulter (C. C.) 131 Fed. 282, which was much quoted and relied upon by complainants at the hearing, it was made to appear, and it is stated in the opinion it was conceded by the defendants, that the property of the state was assessed at not more than 70 per cent. of its cash value in 1891, and that there was as much property, compared in quantity, in 1902 as in 1891; and it was shown that in the year 1891 the assessments aggregated $480,930,623, and for the year 1902 they aggregated $534,417,269. From this, and from other testimony in the case, and other methods of computation set up by the judge in his opinion, which counsel for complainants say was followed by the members of the tax commission in this case, he finds that there was an illegal discrimination, within the requirements of the cases, and that "the taxable property in the state was systematically, habitually, and intentionally undervalued to at least the extent of 20% for the year 1902, first by the local assessing officers, and then by the equalizers." The court in its opinion said:

"The way we view it, to permit the valuation of complainant's intangible property, as made, to stand, would be a palpable violation of its rights. It is an attempt to make it pay on a 100% valuation, when the bulk of the taxpayers pay on not exceeding an 80% valuation. This of itself is sufficient to require that this court should intervene."

When this case came before the Supreme Court of the United States (Coulter v. Louisville & Nashville R. Co., supra), the language used in reversing the decree below and dismissing the bill, when applied to the case at bar, seems to us to dispose of this contention of the complainants. Mr. Justice Holmes, in announcing the unanimous opinion of the court, said:

"The undervaluation in the counties, looked at from the point of view just indicated, also does not appear to have been such as to warrant the action of the court. It is not contended that a mere undervaluation would be enough. It is admitted that it must have been systematic and intentional. There is, no doubt, a natural inclination to think such an undervaluation probable, when it is suggested. But what is the proof? The state Constitution, whatever the statutes may have said, seems popularly to have been understood to have made a great change in the law. Practice before its adoption, therefore, can hardly raise a presumption as to practice afterwards, even on the liberal assumption that it properly could be considered in evidence. It is obvious that the accidental sales in a given year may be a misleading guide to average values, apart from the testimony that some at least of the conveyances did not report true prices, yet they furnish the chief weapon of attack. The testimony as to the board of equalization taking eighty per cent. of the reported sales was explained by the members of the board. It would be going very far to assume that they were committing perjury because to another mind the sales seemed more significant, and the explanations not very good. Inequality, we repeat, is nothing, unless it was in pursuance of a scheme. To make out that scheme, the anomalous course was followed of putting members of a tribunal established by law upon the witness stand to testify to the operations of their minds in doing the work

intrusted to them. Fayerweather v. Ritch, 195 U. S. 276–306, 307, 25 Sup. Ct. 58, 49 L. Ed. 193. But the prevailing testimony was that no such scheme was entertained. Whatever we may surmise or apprehend, making allowance for a certain vagueness of ideas to be expected in the lay mind, for the reasonable differences of opinion among the most instructed and competent men, and for the uncertainty of the elements from which a judgment was to be formed in the first instance, considering the still greater uncertainty of those from which the local judgment must be controlled, if at all, by persons having only the printed record before them, considering further that to maintain the bill imputes perjury to many witnesses whose character is not im-. peached, and finally recalling once more that we are dealing with a case that properly was not cognizable in the Circuit Court, we are of opinion that the bill must be dismissed."

The failure of complainants to show a fraudulent, intentional, systematic undervaluation of the property not assessed under the statute under which their taxes are levied makes a determination of the question of the undervaluation of the railroad properties unnecessary.

Decrees may be entered dismissing the bills.

### NOTE.

#### Michigan Constitution, Article 14, as Amended in 1900.

Sec. 10. The state may continue to collect all specific taxes accruing to the treasury under existing laws. The Legislature may provide for the collection of specific taxes from corporations. The Legislature may provide for the assessment of the property of corporations, at its true cash value, by a State Board of Assessors and for the levying and collection of taxes thereon. All taxes hereafter levied on the property of such classes of corporations as are paying specific taxes under laws in force on November sixth, A. D., nineteen hundred, shall be applied as provided for specific state taxes in section one of this article.

Sec. 11. The Legislature shall provide an uniform rule of taxation except on property paying specific taxes, and taxes shall be levied on such property as shall be prescribed by law: provided, that the Legislature shall provide an uniform rule of taxation for such property as shall be assessed by a State Board of Assessors, and the rate of taxation of such property shall be the rate which the State Board of Assessors shall ascertain and determine is the average rate levied upon other property upon which ad valorem taxes are assessed for state, county, township, school and municipal purposes.

\* \* \* \* \* \* \* \* \* \* \*

Sec. 13. In the year one thousand nine hundred and one, and every fifth year thereafter, and at such other times as the Legislature may direct, the Legislature shall provide for an equalization of assessments by a state board, on all taxable property, except that taxed under laws passed pursuant to section ten of this article.

#### Act No. 173, p. 236, Pub. Acts 1901.

An act to provide for the assessment of the property of railroad companies, union station and depot companies, express companies, car loaning companies, stock car companies, refrigerator car companies, and fast freight line companies; and for the levy of taxes thereon by a State Board of Assessors, and for the collection of such taxes.

The People of the State of Michigan enact:

*Who to constitute state board of assessors.*

Section 1. That the Board of State Tax Commissioners created under the laws of this state, shall ex officio constitute a State Board of Assessors, one of whom shall be elected chairman of said board.

*Who to be secretary—Duties of—Proviso—Further proviso.*

Section 2. The secretary of the Board of State Tax Commissioners shall be ex officio secretary of the State Board of Assessors without extra compen-

sation, and shall keep a record of all its proceedings in addition to such other duties as may be required of him by said board, and shall devote his whole time to the duties of his office. In addition to the secretary said board may employ such other clerical assistance as may be necessary and required to perform the duties imposed upon it by this act: provided, that the compensation paid for such clerical assistance shall not in any case exceed one thousand dollars for each person employed, per annum: provided, further, that said board may employ such other assistance as may be necessary, with the consent of the Governor and the Board of State Auditors. The compensation of the said secretary and clerks, and all other necessary expenses incurred in carrying out the provisions of this act, shall be allowed by the Board of State Auditors upon proper vouchers approved by the chairman and secretary of the board, and paid by the State Treasurer out of the general fund.

*Board to have access to papers, etc.—May subpœna witnesses—Compensation of witnesses—Of persons serving subpœna—Powers of board.*

Sec. 3. Said board shall have excess [access] to all books, papers, documents, statements and accounts, on file or of record in any of the departments of state, subject to the rules and regulations of the respective departments relative to the care of public records. It shall have like access to all books, papers, documents, statements and accounts, on file or of record in counties, townships and municipalities. It shall have the right to subpœna witnesses, upon a subpœna signed by the chairman of said board and attested by the secretary thereof, delivered to such witnesses, which subpœnas may be served by any person authorized to serve subpœnas from courts of record in this state, and the attendance of witnesses may be compelled by attachment, to be issued by any circuit court in this state, upon proper showing that such witness has been properly subpœnaed and has refused to obey such subpœna. The person appearing in response to such subpœna shall receive like compensation as is allowed by the statutes of this state to witnesses in the circuit court, to be allowed by the Board of State Auditors upon the presentation of a copy of such subpœna, with the number of days' service and mileage endorsed thereon and approved by a member of said Board of Assessors, or the secretary thereof. The person serving such subpœna shall receive the same compensation now allowed to sheriffs or other officers for serving subpœnas. Said board shall have power to examine witnesses under oath, said oath to be administered by any member of the board, or by the secretary thereof. It shall have the right to inspect and examine the books, papers or accounts of any corporation, firm or individual owning property to be assessed by said board, and if such corporation, firm or individual refuse to permit said inspection and examination, or neglect or fail to appear before said board in response to its subpœna, said corporation, firm or individual shall, for each such refusal, neglect or failure, forfeit the sum of five hundred dollars to the state, the sum so forfeited to be recovered in a proper action brought in the name of the people of the State of Michigan, in any court of competent jurisdiction.

*Duties of board.*

Sec. 4. It shall be the duty of said board to make an annual assessment upon an assessment roll to be prepared by said board, of the property having a situs in this state as hereinafter defined, of railroad companies, union station and depot companies, express companies, doing business within this state, car loaning companies, and refrigerator and fast freight line companies, and all other corporations owning, leasing, running or operating any freight. stock, refrigerator, or any other cars, not being exclusively the property of any railroad company paying taxes upon its rolling stock under the provisions of this act, over or upon the line or lines of any railroad or railroads in this state.

*Term property, what to include—Proviso—Term company, how applied— "Property situs in state," what to include.*

Sec. 5. The term property as used in this act shall be deemed to include all property, real or personal, belonging to the corporation subject to taxation under this act, including the right of way, roadbed, stations, cars, rolling stock, tracks, wagons, horses. office furniture, telegraph or telephone poles, wires, conduits, switchboards, and all other property used in carry-

ing on the business of said corporations or owned by them respectively, and all other real and personal property and all franchises, said franchises not to be directly assessed, but to be taken into consideration in determining the value of the other property: provided, however, that this definition shall not include, apply to or subject to taxation such real estate as is owned and can be conveyed by such corporations under the laws of this state which is not actually occupied in the exercise of their franchises or in use in the proper operation of their roads or their corporate business; but such real estate so excepted shall be liable to taxation in the same manner and for the same purposes and to the same extent and subject to the same conditions and limitations as to the collection and return of taxes thereon, as is other real estate in the several townships or municipalities in which the same may be situate. The term company, corporation or association, wherever used in this act, shall apply to and be construed as referring respectively to any railroad company, union station and depot company, express company, car loaning company or refrigerator or fast freight line company, and any and all other corporations subject to taxation under this act. The term "property having a situs in this state" shall include all the property, real and personal, of the corporations enumerated in this act, owned, used and occupied by them within the limits of this state, and also such proportion of the rolling stock, cars and other property of such corporations as is used partly within and partly without this state, as herein provided to be determined.

*Corporation to file report with board.*

Sec. 6.[1] The several corporations enumerated in this act, doing business in this state, shall annually, between the first and thirtieth days of June in each year, under the oath of the president, secretary, treasurer, superintendent or chief officer of such company, make and file with the State Board of Assessors, in such form as said board may provide, upon blanks to be furnished by said board, a statement containing the following facts:

### Railroad, Union Station and Depot Companies.

*Blanks, what to contain.*

The blanks furnished to railroad and union station and depot companies, shall provide for the following information:

*Name.*

First. The name of the company.

*Nature, etc.*

Second. The nature of the company, and under the laws of what state or country organized.

*Location.*

Third. The location of its principal office.

*Address of Officers.*

Fourth. The name and post office address of the president, secretary, auditor, treasurer and superintendent or general manager.

*Manager.*

Fifth. The name and post office address of the chief officer or managing agent of the company in Michigan.

*Number of shares.*

Sixth. The number of shares of capital stock.

*Value.*

Seventh. The par value and market value, or if there be no market value, the actual value, of the shares of stock on the second Monday of April of the year in which the report is made.

*Statement of real estate.*

Eighth. A detailed statement of the real estate owned by the company in Michigan, and where situate, and the value thereof.

*Personal property.*

Ninth. A detailed statement of the personal property, including moneys and credits owned by the company in Michigan, on the second Monday in April in the year in which the report is made, where situate, and the value thereof.

---

[1] Amended by Act No. 45, p. 52, of 1903; given as previous to amendment.

*Value of real estate outside of state.*

Tenth. The total value of the real estate owned by the company situate outside of Michigan.

*Personal property.*

Eleventh. The total value of the personal property of the company situate outside of Michigan.

*Length of lines.*

Twelfth. The whole length of their lines, and the length of so much of their lines as is within or is without Michigan, which lines shall include what said railroad companies control and use as owners, lessees, or otherwise.

*Gross receipts.*

Thirteenth. A statement of the entire gross receipts of the companies, from whatever source derived, for the year ending the second Monday of April in the year for which the report is made.

*Such facts as board may require.*

Fourteenth. Such other facts and information as said board may require, in the form of the returns prescribed by it.

### Express Companies.

*Blanks, what to contain.*

The blanks furnished to express companies shall provide for the following information:

*Name.*

First. The name of the company.

*Nature.*

Second. The nature of the company and under the laws of what state or country organized.

*Location.*

Third. The location of its principal office.

*Address of officers.*

Fourth. The name and post office address of the president, secretary, auditor, treasurer and superintendent or general manager.

*Manager.*

Fifth. The name and post office address of the chief officer or managing agent of the company in the state of Michigan.

*Number of shares.*

Sixth. The number of shares of capital stock, (a) authorized, (b) issued.

*Value.*

Seventh. The par value and market value, or if there be no market value, the actual value of the shares of stock, together with the total amount of bonded indebtedness, on the second Monday of April of the year for which the report is made.

*Value of real estate in state.*

Eighth. The situation, income and value in detail of its real estate in this state.

*Outside.*

Ninth. The total income from and cash value of all its real estate situated outside of this state.

*Personal property in state.*

Tenth. A full and correct inventory, at the true cash value, of its personal property, including moneys and credits, within this state.

*Outside.*

Eleventh. The true cash value of all its personal property, including money and credits without this state.

*Names, etc., of lines.*

Twelfth. The whole length and names of railroad lines and water and stage routes over which it did business, and separately, in detail, the portions of such lines and routes within this state, and the portion of such routes over navigable waters of the United States within this state.

*As board may require.*

Thirteenth. Such other facts and information as may be deemed necessary by the State Board of Assessors, or any member thereof, to the proper assessment of the property of such company.

Car Loaning, Stock Car, Refrigerator and Fast Freight Line Companies, and Other Car Companies.

*Blanks, what to contain.*

The blanks furnished to car loaning, stock car, refrigerator and fast freight line companies shall provide for the following information:

*Name.*

First. The corporate name of the company.

*Nature.*

Second. The nature of the business of said company, and under the laws of what state or country organized.

*Location.*

Third. The location of its principal office.

*Names of officers.*

Fourth. The name and post office address of the president, secretary, auditor, treasurer and superintendent or general manager.

*Location of principal office in state—Name of manager.*

Fifth. The location of its principal office in the state of Michigan, together with the name and address of the chief officer or managing agent of the company in Michigan.

*Number of cars.*

Sixth. The total number of cars and rolling stock of any such corporation run over or operated upon any line or lines of railroad within this state each day during the entire year preceding the date of making and filing such report.

*Cost of each.*

Seventh. The cost of construction of each of said cars.

*Time in service.*

Eighth. The length of time same has been in service.

*Cash value of each.*

Ninth. The cash value of each of said cars so operated and run in the state, at the time of making and filing such report.

*As board may require.*

Tenth. And such other and additional information as may be deemed necessary by said board, or any member thereof, to the proper assessment of the cars of such company in this state in accordance with the provisions of this act and to the performance of the duties imposed upon it hereby.

*Blanks, when furnished—Proviso—Procedure when company refuses to make statement—Penalty.*

Sec. 7. Blanks for making the statements provided for in section six shall be furnished to such companies on making application to said board: provided, that the reports hereby provided for shall not in any way relieve any of said companies from making the reports now required to be made to other state officers. In case any company fails or refuses to make the statement required by this act, or refuses to furnish any information requested, the board shall inform itself as best it may on the matters necessary to be known, in order to discharge its duties with respect to the assessment of the property of such company. Any company which shall refuse or neglect to make the report required by this act within the time specified, shall be subject to a penalty of five hundred dollars for each day of the continuance of such neglect or refusal to file said report, to be recovered in a proper action brought in the name of the people of the state of Michigan in any court of competent jurisdiction.

*When board to prepare assessment roll—Board may inspect property—True cash value, how determined—Of express companies—Actual—Assessment, how determined—Cash value of car loaning, etc., how obtained—Total valuation, how determined.*

Sec. 8.[2] Subsequent to the filing of the reports required in the preceding section, and prior to the fifteenth day of December in each year, it shall be the duty of the said State Board of Assessors, to prepare an assessment roll as provided in section four of this act, upon which they shall assess

---

[2] Amended by Act No. 45, p. 54, of 1903; given as previous to amendment.

at the true cash value on the second Monday of April of the year in which the assessment is made, all the property of the companies herein enumerated subject to taxation under this act, which said assessment shall not be final until reviewed as hereinafter provided. For the purpose of arriving at the amount and character and the true cash value of the property belonging to said companies as appearing upon the assessment roll for the purpose of assessment and taxation, the said board may personally inspect the property belonging to said companies, and may take into consideration the reports filed under this act, the reports and returns of such companies filed in the office of any officer of this state, and such other evidence as may be obtainable bearing thereon. In determining the true cash value of the property of railroad and union station and depot companies which own, lease or operate lines partly within and partly without this state, the said board shall be guided, in ascertaining the property subject to taxation in Michigan, by the relation which the number of miles of main track within the state of Michigan bears to the entire mileage of the main track of said companies both within and without this state. In determining the cash value of the property of express companies, they shall ascertain and determine the actual value in money of the entire amount of the capital stock and bonded indebtedness of such express company. From the amount so obtained and determined, said board shall deduct the actual value of all real estate owned by it as ascertained by said board, and the actual value of all its personal property which is not used in the express business of such express company. And the remainder thus obtained shall be used in determining the assessment of such express company in the following manner: The said board shall then divide the amount as obtained above by the total number of miles of railroad, stage, water and other routes over which the company did business, to obtain the value per mile, and shall then multiply the value per mile thus obtained by the total number of miles of such routes within this state, exclusive, however, of the number of miles of water routes over the navigable waters of the United States within this state, to which result shall be added the value of all real estate owned by such express company in this state, as determined by said board, and the sum so obtained shall be taken and considered as the actual value of the property of such express company subject to assessment and taxation in this state. In ascertaining the cash value of the property of car loaning, stock car, refrigerator, fast freight line and other car companies subject to taxation under this act, they shall ascertain the average number of cars used in this state during the year preceding the date of the filing of the report mentioned in the preceding section, such average to be determined by dividing the total number of cars so used or operated within this state during said year by the total number of days on which said cars were so used or operated within this state; and they shall also ascertain the average cash value of such average number of cars, and from said data the total valuation shall be determined and shall be the assessment against the property of said corporation.

*What descriptions roll to contain—Railroad companies, etc.—Car loaning companies, etc.—Express.*

Sec. 9. Upon said assessment roll, after the names of each of the companies assessed thereon, shall be placed a general description of the properties of said companies, which shall be deemed to include all of the properties of said companies liable to taxation under this act. In the case of railroad, union station and depot companies, such general description may be as follows: "Real estate, rolling stock, right of way and appurtenances thereto, and all other property used in carrying on the corporate business and subject to taxation by a State Board of Assessors." In the case of car loaning, stock car, refrigerator and fast freight line and other car companies, the following general description may be used: "Cars subject to taxation by a State Board of Assessors." In the case of express companies, the following general description may be used: "Property subject to taxation by a State Board of Assessors." In an appropriate column opposite the names of said corporations shall be extended the cash valuations of the properties of said companies so assessed.

*When board to be in session—May correct roll—May place omitted property on roll—Proviso—Final valuation—When board to certify to roll.*

Sec. 10.[3] On the third Monday of December in each year, it shall be the duty of the State Board of Assessors to meet at the state capitol at Lansing, and to continue in session from day to day for so long a period as may be necessary, not later than the fifteenth day of January next thereafter, for the purpose of reviewing said assessment roll, and any company or person interested shall have the right to appear during said period and be heard as to the valuation of the property of any company, and said State Board of Assessors may, on such application or on its own motion, correct the assessment or valuation of the property of such company in such manner as will, in its judgment, make the valuation thereof just and equal; and for the purpose of arriving at the true cash value of the properties assessed on said assessment roll, may subpœna witnesses as provided in section three of this act and have such hearing as may be deemed necessary. In case it shall appear or be made to appear to the members of said board, acting in review for assessment purposes, that the property of any corporation subject to taxation under the provisions of this act shall have been omitted from said assessment roll, it shall place the same thereon and make the assessment thereof as required in sections eight and nine of this act: provided, that any such assessment shall take place in time to allow five full days for the review of the same before the expiration of the time herein provided for the completion of the review. After said State Board of Assessors shall have completed the review of said rolls as herein provided, they shall place opposite each description of property in said roll, in a column provided for that purpose, the true cash value of the same as ascertained and determined by them, and such valuation so fixed by them shall be the final valuation upon which the tax upon said property shall be levied and spread as herein provided. After said board shall have completed the review of said roll, a majority thereof shall certify under their hands officially, and spread on said roll, a certificate to the effect that the same has been acted upon and reviewed in accordance with law, which certificate shall state all the alterations, changes, corrections and additions made in or to the assessment or valuation of the property appearing on said roll.

*County clerk to make report, what to contain—Assessors, etc., to make—In case officers fail to report—Penalty.*

Sec. 11.[4] It shall be the duty of the county clerk in each county in this state, as soon as possible after the equalization of the board of supervisors of his county of the assessment rolls of the several municipalities therein, and not later than the first day of November in each year, to make a report, duly certified, to the State Board of Assessors, of the record of such equalization and of the record required to be made under section thirty-seven of the general tax law, being section three thousand eight hundred sixty of the Compiled Laws of Eighteen Hundred Ninety-Seven, as appears upon the records of such board of supervisors, which report shall, among other things, contain a statement of the amount of ad valorem taxes to be raised in the several municipalities of such county for state, county, municipal, township, school and other purposes, and a statement of the aggregate valuation of the property in each of said several municipalities, as taken from the assessment rolls of said municipalities for the year in which such equalization is made. It shall be the duty of the supervisor or other assessing officer of cities and villages in this state governed by special charters, which provide for the collection of ad valorem taxes, which are not reported to the board of supervisors for the purposes of equalization or review, and the supervisors or other assessing officers of cities organized under general laws, to make, within the time above limited, a properly certified report to the State Board of Assessors of all ad valorem taxes raised in any of said municipalities, which have not been reported to the board of supervisors for the purposes of equalization and review. In case any county clerk or any

---

[3] Amended by Act No. 45, p. 55, of 1903; given as previous to amendment.
[4] Amended by Act No. 45, p. 56, of 1903; given as previous to amendment.

supervisor or assessing officer shall neglect or fail to make the report by this section required, within the time limited, the said State Board of Assessors shall inspect and examine, or cause an inspection and examination of the records of said board of supervisors, or in cities affected by this section, an examination of the records of the proper officer, for the purpose of procuring the information required for the purpose of arriving at the average rate of taxation in this state; and the said board, in addition thereto, may require such reports on blanks which it shall prepare and furnish therefor, from all county, state and municipal officers, as it shall deem necessary to the accomplishment of the purpose of this act. Any county clerk, supervisor or assessing officer who shall fail to make the report required by this section shall be subject to a penalty of one hundred dollars, to be recovered in a proper action in the name of the people of the state of Michigan, in any court of competent jurisdiction.

*Board to ascertain average tax.*

Sec. 12.[5] As soon as the reports required by the preceding section to be filed have been filed, or the information therein required to be procured shall have been procured, and not later than the fifteenth day of December in each year, the said State Board of Assessors shall ascertain and determine the average rate of taxation for the then current year levied upon other property upon which ad valorem taxes are assessed for state, county, township, school and municipal purposes, and shall enter the same upon its records forthwith, together with the method by which such average rate was ascertained and determined.

*Amount taxed to be extended on roll—Certificate to be attached—What to contain—To whom roll delivered—Taxes, when payable—When to bear interest, rate—To become lien—Lien, how enforced—Warrant to be annexed to roll—Collections by distress, etc., how authorized—Proviso.*

Sec. 13.[5] Said board shall tax the property of the several companies as assessed by it at the rate as determined by it, and the amount of tax to be paid by each of said companies shall be extended upon said assessment roll opposite the descriptions of their respective properties. After the completion of said tax roll, and prior to the first day of February in each year, the said board shall attach thereto a certificate signed by the members of the board, or a majority thereof, which shall be as follows: "We do hereby certify that we have set down in the above assessment roll all the property of railroad companies, express companies, union station and depot companies, car loaning, stock car, refrigerator and fast freight line and other car companies liable to be taxed in this state, according to our best information, and that we have estimated the same at what we believe to be the true cash value thereof, and that we have assessed the taxes thereon at the average rate of taxes for state, county, township, school, municipal and other purposes, levied through the state during the present year, as determined by us." The said tax roll shall thereupon be forthwith delivered to the Auditor General, who shall immediately notify by registered mail the several companies taxed thereon to pay the taxes extended thereon to the State Treasurer. The said taxes shall be payable on the first day of March following the assessment and levy thereof, and shall be in lieu of all taxes for state and local purposes, not including special assessments on property particularly benefited made in any county, city, village or township. All taxes not paid before the first day of April in the year in which the same are payable shall bear interest at the rate of one per cent. per month thereafter. The taxes so extended against said companies shall forthwith become a debt due from each of said companies to the state, and shall constitute a lien upon all the property of said companies, real, personal and mixed from the time of the extension until the payment thereof, which lien shall take precedence of all demands, judgments, assignments by warranty deed or otherwise, or decrees against said companies, which lien and debt may be enforced by seizure or sale of said property or such portion thereof as may be necessary to satisfy the same, as hereinbefore provided. The State Board of

---

[5]Amended by Act No. 45, p. 57, of 1903; given as previous to amendment.

Assessors shall, upon the completion of said roll and the correction herein-before provided for, annex to said roll a warrant signed by the state board, or a majority of them, commanding the Auditor General to collect the several sums mentioned in the last column of such roll, and being the sum for which the said company was assessed and was liable to pay for a tax upon its property under the provisions of this act for the purposes provided for in this act; and the said warrant shall authorize and command the auditor general, in case any corporation named in the assessment roll shall neglect or refuse to pay its tax, to levy the same by distress and sale of the properties of said corporation, or such portion thereof as shall be necessary to raise sufficient money to satisfy said tax and the expense of said sale, after giving the same notice of such sale as provided for in the general laws of this state for the sale of property seized for taxes and offered for sale: provided, he may bring an action in the name of the people of the state of Michigan in any court of competent jurisdiction in the state of Michigan, or in any other state, for the enforcement of said lien, and upon recovery of judgment or decree therein the same may be collected by execution, levy and sale, as in other cases, upon judgments in courts of record.

*Procedure when tax judged illegal—When certain payments applied on re-assessment.*

Sec. 14. If any court of competent jurisdiction shall adjudge that any tax levied under the provisions of this act is illegal on account of any irregularity or informality in the determination of the average rate of taxation required to be ascertained and determined by said State Board of Assessors, or for the reason that such average rate has not been ascertained and determined according to law, it shall be the duty of said State Board of Assessors, whether any part of the taxes assessed and levied have been paid or not, to redetermine and reascertain the average rate of taxation throughout the state in accordance with law, and when such redetermination and reascertainment has been had, to make a duplicate of the original assessment roll and to extend the taxes thereon according to such redetermined and reascertained average rate, and when such duplicate roll has been made and the taxes extended thereon in the manner provided in this section, it shall be of the same force and effect as an original assessment made in accordance with law. All proceedings on the redetermination and reascertainment of such average rate and for the extension and collection of taxes upon said duplicate assessment roll shall be conducted in the method originally provided for, so far as may be. Whenever any sum or part thereof levied upon any property subject to taxation under this act so set aside has been paid and not refunded, the payment so made shall be applied upon the reassessment upon said property, and the reassessment to that extent shall be deemed to be satisfied.

*When tax not to be held invalid.*

Sec. 15. No tax assessed upon any property and no average rate determined by said State Board of Assessors as hereinbefore required, shall be held invalid by any court of this state on account of any irregularity in any assessment or on account of any assessment or tax roll not having been made or proceeding had within the time required by law, or on account of the property having been assessed without the name of the owner, or in the name of any corporation or person other than the owner, or on account of any other irregularity, informality or omission, if the method and manner of ascertaining and determining the average rate of taxation of property in this state is in accordance with the constitution and statutes of this state.

*Taxes, how applied—Proviso.*

Sec. 16. All taxes collected under this act shall be applied in paying the interest upon the primary school, university and other educational funds, and the interest and principal of the state debt, in the order herein recited, until the extinguishment of the state debt other than the amounts due to educational funds, when such taxes shall be added to and constitute a part of the primary school interest fund; and such taxes as are collected under the provisions of this act shall be treated and disbursed as specific taxes are now treated and disbursed: provided however, that if any of the corporations, companies or associations herein named were not paying specific taxes

to this state on November sixth, A. D. nineteen hundred, the tax collected from such corporations, companies or associations under this act shall be paid into and become a part of the general fund of the state.

*When first assessment to be made—Time existing laws to continue in force.*

Sec. 17. The first assessment under this act shall be made as herein required in the year nineteen hundred and two. Nothing herein contained shall be deemed a waiver or affect the collection of the specific taxes required to be paid by the companies hereby affected, on the first day of July in the year nineteen hundred and one, and on the first day of July in the year nineteen hundred and two, under the general laws upon the property or business of such companies operated within this state. The existing laws providing for the collection of such specific taxes shall be continued in force until the collection and payment of all taxes levied thereunder for the year nineteen hundred and one and previous years.

*Penalty for wilfully making wrong assessment.*

Sec. 18. If said board shall wilfully assess any property at more or less than what the members taking part in making such assessment believe to be its true cash value, the members voting in favor of such assessment shall be guilty of a misdemeanor, and on conviction thereof shall be punished by imprisonment in the county jail not exceeding one year, or by a fine not exceeding five thousand dollars each.

*Penalty for offering board gratuities, etc.*

Sec. 19. If any person, company, association or corporation whose property is subject to assessment under this act shall directly or indirectly promise, offer or give to any member of said board, during his term of office, or to any other person at his request, any gratuity of any kind whatever, such person or corporation shall forfeit to the state the sum of ten thousand dollars for each such offense, to be recovered in an action in the name of the people of the state of Michigan, in any court of competent jurisdiction. And the recovery of such fine under this act shall not constitute a bar to any prosecution of the person or corporation so offending under the criminal laws of this state.

*Repealing clause—Proviso.*

Sec. 20. All other acts or parts of acts whether contained in any acts for the incorporation of railroad companies, union station and depot companies, express companies, car loaning companies, stock car companies, refrigerator car companies, and fast freight line companies, or in any other law of this state, so far as such acts or parts of acts are inconsistent with this act, and no further, are hereby repealed, except as herein expressly stated: provided however, that all rights which the state now has under any of said acts, for taxes or penalties, shall not in any way be affected by this act, and shall not constitute a bar to any prosecution or recovery on account of such taxes or penalties.

Approved May 27, 1901.